IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: <br><br> UTILITY LINE SECURITY, LLC, <br><br> Debtor. <br><br> UTILITY LINE SECURITY, LLC,, <br><br> Movant <br><br> v. <br><br> No Respondent | Bankruptcy Case No. 11-21630-JFK <br><br> Chapter 11 <br><br> Judge Judith K. Fitzgerald |

## EMERGENCY MOTION FOR ORDER AUTHORIZING PAYMENT OF CERTAIN PREPETITION CLAIMS

AND NOW, comes Utility Line Security, LLC ("*ULS*"), by and through its undersigned counsel, the Bernstein Law Firm, P.C., and files this *Emergency Motion for Order Authorizing Payment of Certain Prepetition Claims,* stating as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this case and this Motion in this district is proper under 28 U.S.C. § 1408 and 1409.

2. The relief sought in the Motion is based upon sections 105(a) and 363(b) of the Bankruptcy Code.

### BACKGROUND

3. On March18, 2011 (the "*Petition Date*"), ULS filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "*Bankruptcy Code*").

4. ULS is in the business of repairing water and sewer lines for the residents of the City of Pittsburgh, as well as correcting combined sewer overflows ("*CSO*") by doing storm sewer and sanitary sewer separations via a five (5) year warranty contract with the Pittsburgh Water and Sewage Authority executed on December 30, 2009 (the "*Agreement*").

5. The Agreement came about as a result of a series of events that began on January 29, 2004 when the Pittsburgh Water and Sewage Authority (the "*PWSA*") entered into a consent order and agreement with the Pennsylvania Department of Environmental Protection and the Allegheny County Health Department (the "*Consent Order*"), which in part sought to resolve issues with the City of Pittsburgh's combined sewer system. The combined sewer system combines storm water runoff and sanitary and industrial waster water that can cause the volume of water in the pipes to overflow and dump raw sewage in streams, ditches, rivers and/or lakes.

6. The Consent Order required the PWSA to work towards controlling these overflows. However, to the extent problems were identified with a ratepayers sewer lateral (section from the main line to the ratepayers property) the individual ratepayer was responsible for all expenses to remedy the problem.

7. Soon thereafter, the City of Pittsburgh enacted an ordinance mandating that the PWSA conduct dye-testing on ratepayer laterals to ensure the integrity of the connection between the main line and lateral. Of the 18,000 lateral inspected as a sampling, almost 25% were deficient. Many ratepayers are financially unable or unwilling to fix these expensive problems.

8. This sleeping giant, i.e., Pittsburgh's aging and deficient water and sewer lines, might be one of the biggest unknown threats to the financial health of the region. Thus, the PWSA resolved to address and fix this problem.

9. In 2009 the PWSA issued a request for proposals seeking proposal for a line warranty program to be offered to PWSA ratepayers. The PWSA received only two proposals and the PWSA board of directors determined that the proposal submitted by ULS offered the most coverage for the best price. On July 31, 2009 the PWSA board of directors passed a resolution authorizing the PWSA to enter into an agreement with ULS for the purpose of providing PWSA ratepayer with "opt-in" line warranties.

10. When an insufficient number of ratepayers accepted the original program, thus failing to adequately address the underlying problem, the PWSA approached ULS about amending the program in order to recast it as an "opt-out" warranty program and in exchange ULS lowered its monthly fee and increased coverage and benefits[1]. Thereafter, on December 30, 2009 the parties executed the Agreement.

11. In its first year of business in 2010, USL repaired more than 1,110 water and sewer lines and corrected approximately 130 CSO's at a value of more than $4,000,000.

12. The filing of this bankruptcy was necessary to protect ULS's assets in the face of anticipated premature and improper attempted termination of the Agreement, which would cause severe financial difficulties for ULS and unjustly burden residents and beneficiaries of the Agreement. This was necessitated by an opinion of the Court of Common Pleas of Allegheny County ("***Common Pleas Opinion***") stating that the Agreement was in violation of the Pennsylvania Municipal Authorities Act Section 5607(b), apparently prompting the PWSA to prematurely inform customers that the Warranty Program (as defined below) was terminated.

13. On Debtor's Emergency Motion for Order Authorizing Debtor to Fully Honor and Continue Warranty Program and Compel Compliance by PWSA, heard by Judge Deller on

---

[1] For $5 monthly fee ratepayers get unlimited coverage.

March 22, 2011, the Court entered an Order (Doc. No. 23) which determined, *inter alia,* that the Agreement was not terminated, was executory and subjection to assumption.

14. In addition, Judge Deller left to the Debtor's business judgment whether or not to honor Warranty Program post-petition.

15. Prior to the Petition Date and in the ordinary course of ULS's business, ULS provided its customers with warranties to service and repair water and sewer lines for a monthly flat fee (the "***Warranty Program***"). Specifically, ULS provides warranties for repairing water and sewer lines for the residents of the City of Pittsburgh, as well as correcting CSO's at any time during the period the warranty was in effect. Additionally, ULS is obligated to provide concrete and asphalt restoration services ("***Restoration***") where services were performed to repair water and sewer lines.

16. ULS remains in possession of its assets and is managing its business as a debtor-in-possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

## RELIEF REQUESTED

17. It is presently and has always been ULS's primary goal to timely resolve customer claims to the highest satisfaction.

18. ULS estimates that it has twenty-five (25) open warranty claims that repairs have not been completed, as well as approximately fifteen (15) new claims to investigate.

19. In addition, ULS needs to complete Restoration on a number of projects that were started in the winter months and were patched until they could be completed in warmer weather.

20. Debtor estimates the prepetition amounts due its regular contractors at about $715,000.

21. In the ordinary course of ULS's business, ULS utilizes certain specialty plumbers

to correct CSOs and repair water and sewer lines for customers pursuant to the Warranty Program (the "*Critical Vendors*"). Without certain of these vendors, the transition process to alternative services would likely result in a lengthy disruption of essential services, at an incremental cost to ULS and inconvenience to the customers. Any interruption in the services provided by the Critical Vendors would have a detrimental effect on ULS's operations and its ability to restructure its affairs.

22. ULS has about $650,000 in cash at the present time and expects between $100,000 and $150,000 additional funding from payments collected by PWSA before it stopped billing for the Warranty Program. If ULS is unable to appeal or otherwise avoid the effect of the Common Pleas Opinion, these may be all of the funds available to ULS (other than potential damage claims for PWSA's breach of the Agreement) unless ULS amends the Agreement to begin generating new revenue. Regardless, ULS has sufficient funds on hand to complete the work on existing claims, which it estimates to be somewhere between $300,000 - $400,000.

23. By this Motion, ULS seeks entry of an order (the "*Order*") authorizing ULS to make, in its sole discretion, payments to the Critical Vendors in an amount not to exceed $50,000 (the "*Critical Vendor Claims Cap*") in the aggregate. Given the paramount importance to ULS of the services provided by the Critical Vendors, and in order to ensure ULS continues to receive such services after the Petition Date, it is imperative that ULS be authorized to pay the Critical Vendor Claims on an emergency basis.

24. ULS's viability as a water and sewer repair service business is dependent upon ULS's uninterrupted access to the services provided by the Critical Vendors. In some cases, however, ULS believes that failure to pay a portion of certain Critical Vendors' pre-petition fixed, liquidated and undisputed claims (the *"Critical Vendor Claims"*) may result in among

other things, such Critical Vendors: (i) refusing to deliver services without payment of their pre-petition claims; (ii) refusing to deliver services on reasonable credit terms absent payment of prepetition claims, thereby effectively refusing to do business with ULS, and (iii) suffering significant financial hardship such that they would be unable to continue to provide to ULS post-petition.

25. In return for payment of the prepetition Critical Vendor Claims in the ordinary course of business, unless otherwise waived by ULS in its sole discretion, ULS requests authority to use the Critical Vendor Claims Cap to pay a percentage of the pre-petition claim to vendors that agree to do work for ULS post-petition on reasonable terms, which may include up front cash payments, per job deposits and/or credit terms ("*Customary Trade Terms*"). For example, ULS may pay a particular Critical Vendor a greater percentage of its claim from the Critical Vendor Claims Cap if that vendor agrees to offer credit terms or favorable pricing.

26. If any Critical Vendor accepts a payment on account of a prepetition obligation of ULS and thereafter does not continue to provide services to ULS on agreed Customary Trade Terms, any payment made will be deemed an avoidable postpetition transfer under Bankruptcy Code section 549, and therefore, will be recoverable by ULS in cash upon written request. Upon recovery by ULS, the claim will be reinstated as a prepetition claim in the amount so recovered.

27. ULS proposes to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to immediately resume and/or continue on an expedited basis, servicing ULS on terms that are consistent with the agreed trade terms between the parties. Accordingly, ULS proposes that the Order provide as follows to implement the terms of the authority requested by the Motion:

(a) ULS is authorized, in its sole discretion, and the exercise of its business judgment, to make payment to the Critical Vendors on the condition that (i) by accepting payment, the Critical Vendor agrees to maintain or reinstate Customary Trade Terms during the pendency of this Chapter 11 case, and (ii) ULS provide a copy of the Order to each Critical Vendor to which any payment permitted hereunder is made; and

(b) A Critical Vendor's acceptance of payment is deemed to be acceptance of the terms of the Order, and if the Critical Vendor thereafter does not provide ULS with the agreed upon Customary Trade Terms during the pendency of its Chapter 11 case, then any payment of pre-petition claims made after the Petition Date may be deemed to be unauthorized post-petition transfers and therefore recoverable by ULS..

28. The Order shall not, however, be construed to limit, or in any way affect, the Debtor's ability to contest any invoice of a Critical Vendor on any other valid grounds.

29. Nothing in this Motion should be construed as an assumption of any executory contract or unexpired lease between ULS and any of the Critical Vendors, nor should it be construed as a rejection of any executory contract or unexpired lease with any creditor. ULS is in the process of reviewing this matter and reserves all of its rights with respect to the assumption or rejection of any executory contracts. Furthermore, ULS reserves the right to contest on non-bankruptcy grounds the amount claimed to be due by any of the Critical Vendors.

## BASIS FOR RELIEF REQUESTED

30. Payment of certain Critical Vendor Claims is vital to the Debtor's reorganization efforts because (a) replacing the Critical Vendor with another vendor would result in significant hardship to ULS and its estate; (b) failure to pay the Critical Vendors Claims would, in the

business judgment of ULS, result in the Critical Vendor (a) refusing to provide its goods and/or services to ULS, or (b) condition delivery of such services on cash on delivery or other disadvantageous terms; (iii) the Critical Vendors provide services to ULS on advantageous terms; and/or (iv) the Critical Vendors would themselves be damaged by ULS's failure to pay their prepetition claims, resulting in ULS being forced to obtain services elsewhere that would either be at a higher price or not of the quality required by ULS. ULS seeks to pay Critical Vendors Claims only where non-payment of such claims would lead to the interruption of the delivery of services or would seriously disrupt ULS's operations. Thus, ULS submits that the relief requested is narrowly tailored to facilitate ULS's reorganization process.

31. Under Bankruptcy Code section 363, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business. In order to obtain approval for the use of estate assets outside the ordinary course of business, the debtor must articulate a valid business justification for the requested use. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr.S.D.N.Y. 1985). Through payments to Critical Vendors who agree to provide services on Customary Trade Terms, ULS will preserve and protect its business for the benefit of all creditors.

32. As detailed above, maintaining the services provided by the Critical Vendors is vital to ULS's continuing business operations and the success of its Chapter 11 case. Should any Critical Vendor cease doing business with ULS, UL's revenue, cash flow, profitability, and reputation would be significantly impacted. As such ULS submits the Critical Vendor Cap is small relative to the likely damage to the estate should the relief requested herein not be granted. Accordingly, not only will other creditors not be adversely affected by payment of the Critical Vendor Claims, such creditors will in fact benefit by this Court empowering ULS to negotiate

payment to the Critical Vendors to achieve a smooth transition into bankruptcy with minimal disruptions to its operations.

33. Furthermore, to supplement the explicit authority described above, paying the Critical Vendor Claims may also be authorized under Section 105(a) of the Code. Under Section 105, the Court "may issue any order…that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a).

34. A Bankruptcy Court's use of its equitable powers to authorize payment of certain pre-petition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization is not a novel concept. See In re Just for Feet, Inc., 242 B.R. 821, 825 (D.Del. 1999) (to invoke the necessity of payment doctrine, a debtor must show that payment of prepetition claims is critical to the debtor's reorganization.)

35. Numerous courts have used their section 105(a) equitable powers under the necessity of payment doctrine to authorize payment of prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of chapter 11, which is to prevent the debtor from going into liquidation and preserve the debtor's potential for reorganization. See In re Leigh Co. & New England Ry Co., 657 F.2d 570, 581 (3d Cir. 1981)(holding that "if payment of a claim which arose prior to reorganization is essential to the continued operation of the … [business] during reorganization, payment may be authorized even if it is made out of [the] corpus.")

36. Under the doctrine of necessity, a bankruptcy court may exercise its equitable power to authorize a debtor to pay the prepetition claims of certain critical vendors. See In re Columbia Gas Sys., Inc., 136 B.R. 930, 930 (Bankr. D.Del. 1992) (recognizing that "[i]f payment of a prepetition claim 'essential to the continued operation of [the debtor]; payment

may be authorized"). The Third Circuit has adopted the "necessity of payment" doctrine. Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.), 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993)

37. Additionally, under Bankruptcy Code section 1107(a) and 1108, the debtor, operating its business as a debtor in possession under Bankruptcy Code sections 1107(a) and 1108, is a fiduciary "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners. In re CoServ, L.L.C., 273 B.R. 487 (Bankr.N.D. Tex 2002). Implicit in the duties of a chapter 11 debtor in possession is the duty to "protect and preserve the estate, including an operating business's going-concern value." Id.

38. Courts have noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only…by the preplan satisfaction of a prepetition claim." Id. The CoServ court specifically noted that a preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id. at 498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

Id. at 498

39. The Critical Vendor Payments meet each element of the standard laid out in CoServ. First, as described above, the success and ultimate viability of ULS's business is dependent upon servicing its customer's claims, which necessarily requires the Critical Vendors services.

40. Second, the disruption and adverse publicity that would necessarily result from the failure to service claims would threaten ULS's customer base and ultimately, its ability to successfully reorganize, thereby causing harm to ULS that is grossly disproportionate to the cost of the Critical Vendor Payments.

41. Third, there is no other practical or legal alternative to payment of such obligations as the Critical Vendors servicing customers at the Customary Trade Terms is imperative to ULS's reorganization.

42. Therefore, ULS can meet its fiduciary duty as a debtor in possession under Code sections 1107(a) and 1108 only by paying Critical Vendor Claims.

## Need for Emergency Hearing

43. The necessity of this emergency hearing has not been caused by any lack of due diligence by the undersigned or by ULS, but has been brought about only by circumstances beyond the control of ULS or the undersigned.

44. The amount of time needed to present information sufficient under applicable law to enable this Court to enter an order granting the relief requested herein is fifteen minutes. For all the aforementioned reasons, and in light of ULS's need to preserve the going concern value of its business through, among other things, paying Critical Vendors, the relief requested herein is proper and should be granted.

WHEREFORE, ULS prays for the entry of an Order authorizing ULS to make in its

sole discretion Critical Vendor Payments in an amount not to exceed the Critical Vendor Claims Cap in the aggregate and granting such other or further relief as may be just and proper.

Dated: March 28, 2011

Respectfully submitted,

BERNSTEIN LAW FIRM, P.C.

By: */s/ Kirk B. Burkley*
Kirk B. Burkley, Esquire
kburkley@bernsteinlaw.com
PA I.D. # 89511
Suite 2200 Gulf Tower
Pittsburgh, PA 15219
(412) 456-8108 – Phone
(412) 456-8289 - fax

Attorney for ULS